Robert P. SLABY, et al.

v.

William BERKSHIRE, et al.

Civil No. Y–94–1633.

United States District Court,
D. Maryland.

June 17, 1996.

Douglas Clark Hollman, Annapolis, Maryland, for Plaintiffs.

Lynn T. Krause, Annapolis, Maryland; J. Paul Mullen, Baltimore, Maryland; Kathryn Miller Goldman, Baltimore, Maryland; Jonathan P. Sills, Assistant General Counsel, Maryland Commission on Human Relations, Baltimore, Maryland, for Defendants.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, Senior District Judge.

Robert and Louise Slaby filed suit against William Berkshire, 1691 Limited Partnership, Lancer Corporation, William Sporre, Mark Spolarich and James Bell alleging violation of the Americans with Disability Act and the Equal Protection Clause, interference with contract, breach of contract, invasion of privacy, and conspiracy. The Defendants asserted counterclaims for trespass, tortious interference with economic relations, and invasion of privacy. Subsequently, the parties stipulated to a dismissal of William Sporre, Mark Spolarich and the conspiracy claim. By order of May 8, 1996, this Court granted Defendants' Motion for Summary Judgment on the Equal Protection, interference with contract, and breach of contract claims and also dismissed James Bell from the suit. Prior to trial the parties further stipulated to dismissal of Plaintiffs' invasion of privacy claim and Defendants' tortious interference with economic relations claim, and Plaintiffs withdrew their request for a jury trial.

On May 13, 1996 a bench trial was held on the remaining ADA claim and two counterclaims. The findings of fact and conclusions of law as stated herein are in accordance with the provisions of Rule 52(a) of the Federal Rules of Civil Procedure whether or not so stated.

## I. BACKGROUND

William Berkshire is the president of Lancer Corporation, the corporate general partner of 1691 Limited Partnership, which owns Crofton Country Club ("the Club"). The Club consists of an 18–hole golf course, a clubhouse, a pool, and tennis courts. After Berkshire and others bought the Club, they began the long-range project of improving the quality of the golf course to match its championship design. To this end new wells were dug, the water storage was improved, a $500,000 irrigation system was installed and the grounds crew was expanded and trained. The final step in the process was to grow new turf on the course.

The Slabys joined the club in 1972, bought a house adjoining the golf course in 1973 and renewed their membership every year until 1991. In 1989 it had become necessary for Mr. Slaby to use a cart to play golf because he had three heart operations, has intermittent claudication in his legs, is diabetic, suffers from hypertension, and is classified as permanently disabled by Social Security. When Mr. Slaby returned from surgery to play golf in the spring of 1991, he discovered that the club had erected rope barriers and enacted rules limiting carts on the course.

The Club explains that it was necessary to erect rope barriers around the fairways and greens to protect its investment in the turf. The testimony about the extent of rope barriers in the spring and summer of 1991 was mixed, with most witnesses stating that the course was partially roped off, a few stating the entire course was roped off, and Berkshire stating that all holes had some rope. The testimony on the number of cart openings was similarly mixed, with most witnesses stating there were openings for disabled golfers and Mr. Slaby and one other witness stating that there were no openings for disabled golfers. The Slabys also introduced a May 1, 1991, newsletter stating that the barricades *would have* disabled entrances and exits, and interpreted that as proving that openings were not put in until the fall of

1992. But Bill Dorsey, the employee who dug the postholes for the barriers, stated that he placed openings in the barriers while they were being dug at the express direction of Berkshire and Bill Sporre, the resident golf professional. The testimony does establish that the barriers were largely dismantled in 1992 because the turf grew in thicker and faster than expected. The portion of the course roped off has diminished since 1991, and the Club controls turf damage by continually moving the openings in the remaining barriers.

The Club also enacted rules restricting cart use within the rope barriers. Considering the special needs of disabled golfers, the February 25, 1991, rules excepted official disabled carts from these restrictions. Anticipating 80 to 90 disabled golfers, the Club Advisory Board enacted a formal disabled cart policy that required monthly registration of one's disabled status and disabled carts to enter the fairway through certain openings in the barriers. In response to Mr. Slaby's complaints, the Advisory Board revised the policy on August 21, 1991, to allow non-disabled companions in disabled carts and to allow disabled persons to take a cart directly from the rough to the fairway. The system of rules, designed to handle the impact of 80 or so disabled golfers with carts, fell into disuse after the Club realized that only a dozen golfers had sought disabled status. Although the 1991 policy was not formally withdrawn until recently, most witnesses stated that they were not given a copy of the rules upon receiving disabled status but were simply told to use common sense and not abuse their disabled privileges.

## II. THE AMERICANS WITH DISABILITIES ACT

The Slabys seek a court order removing the rope barriers and enjoining future enactment of the rules under Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–12189 ("ADA"). The ADA prohibits discrimination against disabled persons and, in relevant part, defines discrimination to include (1) "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability"

and (2) the failure of places of public accommodation, such as golf courses, to make "reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities...." *Id.* §§ 12182(b)(2)(A)(i)–(ii). *See also id.* § 12181(7)(L). Modifications are measured by a "readily achievable" standard which balances the cost of construction and ability of the business to pay against the need of disabled persons at the facility, so that modifications need only be "able to be carried out without much difficulty or expense." *Id.* § 12181(9).

The majority of witnesses who are disabled golfers at the Club, including those called by the Slabys, testified that they had full access to the course at all times and have had no difficulty playing golf because of the rope barriers or the rules. Tom Houston, an expert in accessibility of golf courses and a disabled golfer confined to a motorized wheelchair, opined that the course was not accessible based on his observations from the road in December 1995, but when he actually played the course shortly before trial he found it "extremely playable." It must be noted that the Club, one of the few golf courses in the area that has a planned disabled program, relied on its own judgment of what was necessary to accommodate disabled golfers because there was very little information about public access generally or to golf courses specifically in 1991. To this day an advisory committee, upon which Tom Houston sits, has yet to adopt guidelines for making golf courses accessible to the disabled. After considering the evidence, the Court finds that placement of the rope barriers and enactment of the rules were reasonable attempts to protect the turf while only mildly inconveniencing golfers and that disabled members were not prevented from golfing.

The Slabys also seek a court order mandating access to other areas of the Club, most notably the clubhouse. The ADA requires the removal of architectural barriers or, if that is not readily achievable, the provision of alternative facilities that are readily achievable. *Id.* §§ 12182(b)(2)(A)(iv)–(v).

Although several alterations have been made to the clubhouse including ramps, new bathrooms, parking spaces, and curb cuts, the second floor and basement of the clubhouse, containing locker rooms and other facilities, remain accessible only by stairs. The Club has attempted to accommodate disabled golfers by making the locker rooms in the pool area available year-round and holding functions such as Ladies Club meetings on the first floor when disabled persons are present. However, Norman Dorf, an architect called by the Slabys, testified that an $80,000 elevator should be built to allow access to the second floor and basement of the clubhouse. But even if the clubhouse was being built today and covered by the stricter accessibility standards for new structures, the ADA specifically disavows requiring an elevator for a two-story structure. *See* 42 U.S.C. § 12183(b). A court order to build an elevator is not necessary because, as Tom Houston testified, only 300 of the 10 million golfers in the United States use wheelchairs and the adapted pool facilities are sufficient to discharge the Club's obligation under the ADA.

Finally, the Slabys contend that Berkshire retaliated against them for exercising their rights under the ADA by telling members of the Club that they were unwelcome. *See* 42 U.S.C. § 12203. One witness testified that Berkshire made such a statement, while all witnesses who were members of the Club denied hearing such a statement. The evidence presented was insufficient to meet Plaintiffs' burden on this claim.

For the foregoing reasons the Court holds that the Club did not violate the ADA and Plaintiffs are not entitled to injunctive relief.

### III. STATE LAW COUNTERCLAIMS

Defendants assert counterclaims of trespass and invasion of privacy (false light). Federal courts have jurisdiction over state claims between non-diverse parties when they are part of the same "case or controversy" as a federal claim. 28 U.S.C. § 1367. Such supplemental jurisdiction has been interpreted to incorporate preexisting caselaw on pendant and ancillary jurisdiction, which required that the claims stem from "a common nucleus of operative fact." *See, e.g., Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir.1995); *White v. County of Newberry, South Carolina,* 985 F.2d 168, 171 (4th Cir. 1993).

Plaintiffs' ADA claim related to the placement of rope barriers on the golf course and enactment of rules for disabled golfers, and required the Court to determine whether the disabled were denied access to the golf course or clubhouse. Resolution of Defendants' counterclaims does not involve these issues but requires the Court to assess whether Mr. Slaby trespassed on Club property or portrayed Berkshire in a false light. Because the counterclaims do not arise from facts that are implicated by the ADA claim, the Court is without jurisdiction and the counterclaims are dismissed without prejudice.

### *ORDER*

In accordance with the attached Memorandum, it is this 17th day of June, 1996, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment for Defendants on Count I BE, and the same IS, hereby ENTERED; and

2. That the counterclaims BE, and the same ARE, hereby DISMISSED without prejudice; and

3. That a copy of this Memorandum and Order be mailed to counsel for the parties.